In the
United States Court of Appeals
For the Eighth Circuit

No. 24-3512

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAPHAEL RAYMOND NUNN,

Defendant-Appellant.

Appeal from the United States District Court
for the District of Minnesota

BRIEF OF DEFENDANT-APPELLANT

KATE ADAMS
ERIC RIENSCHE
Assistant Federal Defenders

Office of the Federal Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Defendant-Appellant*

# SUMMARY OF THE CASE

This is an appeal from a criminal judgment, by which Defendant-Appellant Mr. Nunn was convicted of federal offenses based upon three separate incidents involving unidentified perpetrators. Three issues are presented:

*Issue I.* Mr. Nunn had been arrested, interrogated, and held in custody for a full week, during which he was cooperative with law enforcement. In a second round of *Miranda*-warned custodial interrogation, he felt compelled to admit less-serious unlawful activity to absolve himself of more-serious law enforcement accusations, and uttered the phrase "I think I should get a lawyer." Under the circumstances, this constituted an unambiguous invocation of his *Miranda* right to counsel.

*Issue II.* At trial and without prior notice, the government presented a witness who made a surprise in-court identification of Mr. Nunn as an unidentified perpetrator previously described as African-American, with Mr. Nunn conspicuously seated as the only African-American at defense counsel table. The in-court identification procedure was unnecessarily suggestive and gave rise to a substantial likelihood of misidentification, in violation of the Due Process Clause.

*Issue III.* Given the overall record, the sentence imposed was overly severe and unreasonable, under the rationales offered by the district court.

The issues presented are complex and fact-intensive, and oral argument would likely assist the Court. Mr. Nunn respectfully requests 15 minutes per side.

# TABLE OF CONTENTS

SUMMARY OF THE CASE.........................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ....................................................................v

TABLE OF CITATIONS ...................................................................... vii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE.................................................................4

    A. Charged Offenses...................................................................4

    B. Pretrial Motions ..................................................................6

        1. Defendant Motions ......................................................6

        2. Motions Hearing ..........................................................6

        3. Defendant Statement...................................................7

        4. Ruling..........................................................................8

    C. Final Pretrial Conference.......................................................9

    D. Jury Trial.............................................................................10

        1. SE Kidnapping...........................................................11

        2. JT Theft......................................................................16

        3. CL Robbery ...............................................................18

    E. Verdict ................................................................................22

    F. Sentencing...........................................................................22

SUMMARY OF THE ARGUMENT ...................................................24

ARGUMENT ....................................................................................25

I. Mr. Nunn had invoked his *Miranda* right to counsel during the course of custodial interrogation, triggering the *Edwards* rule requiring that interrogation cease, such that the exclusionary rule required suppression of the post-invocation portion of the Defendant Statement. ...............................................................................................25

   A. Standard of Review ..................................................................25

   B. Principles of Law ....................................................................26

   C. Application to Case .................................................................27

   D. Requested Remedy .................................................................31


II. The in-court identification procedure was impermissibly and unnecessarily suggestive, and in this case gave rise to a "substantial likelihood of irreparable misidentification" in violation of the Due Process Clause. ...............................................................................................32

   A. Standard of Review ..................................................................32

   B. Principles of Law ....................................................................33

      1. Impermissibly Suggestive ...................................................34

      2. Likelihood of Misidentification ..........................................34

   C. Application to Case .................................................................35

      1. Non-Waived Error ..............................................................35

      2. Current Law .......................................................................36

         (a). Impermissibly Suggestive Procedure ............................36

         (b). Likelihood of Misidentification ...................................39

      3. Substantial Rights .............................................................43

      4. Judicial Fairness and Integrity ...........................................45

   D. Requested Remedy .................................................................45

III. The 288-month sentence imposed upon Mr. Nunn is greater than necessary to meet the statutory purposes of federal sentencing, and is thus substantively unreasonable; the alternative upward departure similarly lacks sufficient justification in the record. ...................................................................................................46

    A. Standard of Review.............................................................................46

        1. Upward Variance.......................................................................46

        2. Alternative Departure ................................................................47

    B. Principles of Law.................................................................................47

        1. Upward Variance.......................................................................47

        2. Alternative Departure ................................................................48

    C. Application to Case .............................................................................49

        1. Upward Variance.......................................................................49

        2. Alternative Departure ................................................................51

    D. Requested Remedy ..............................................................................51

CONCLUSION ...............................................................................................52

Certificate of Compliance .............................................................................53

Certificate of Service ....................................................................................54

Addendum

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Arizona v. Roberson,* 486 U.S. 675 (1988).................................31

*Davis v. United States,* 512 U.S. 452 (1994) .......................2, 26

*Edwards v. Arizona,* 451 U.S. 477 (1981)..........................*passim*

*Foster v. California,* 394 U.S. 440 (1969).....................3, 34, 45

*Gall v. United States*, 552 U.S. 38 (2007) ....................3, 48, 50

*Greer v. United States,* 593 U.S. 503 (2021)............................33

*Holguin-Hernandez v. United States,* 589 U.S. 169 (2020) ..................46

*Holman v. Kemna,* 212 F.3d 413 (8th Cir. 2000) ...............27, 31

*Manson v. Brathwaite,* 432 U.S. 98 (1977) ..............................33

*Miranda v. Arizona,* 384 U.S. 436 (1966) .........................*passim*

*Molina-Martinez v. United States,* 578 U.S. 189 (2016).........................33

*Neil v. Biggers,* 409 U.S. 188 (1972).................................3, 33

*Owens v. Bowersox,* 290 F.3d 960 (8th Cir. 2000)..................31

*Perry v. New Hampshire,* 565 U.S. 228 (2012)....................34, 37

*Rosales-Mireles v. United States,* 585 U.S. 129 (2018) ..................45, 47

*Sexton v. Beaudreaux,* 585 U.S. 961 (2018).........................*passim*

*Smith v. Illinois,* 469 U.S. 91 (1984) .................2, 26, 27, 29

*United States v. Bullock,* 35 F.4th 666 (8th Cir. 2022)...........................47

*United States v. Chamberlain,* 163 F.3d 499 (8th Cir. 1998)................................31

*United States v. Clay*, 622 F.3d 892 (8th Cir. 2010) ..............................46

*United States v. Combs,* 44 F.4th 815 (8th Cir. 2022)...........................36

*United States v. Davis,* 103 F.3d 660 (8th Cir. 1996).......................37, 38

*United States v. Eagle Pipe,* 911 F.3d 1245 (8th Cir. 2019) .................49

*United States v. Godsey*, 690 F.3d 906 (8th Cir. 2012).........................48

*United States v. Greene,* 704 F.3d 298 (4th Cir. 2013) ..........................37

*United States v. Harper,* 124 F.4th 1094 (8th Cir. 2025) ...................34, 35

*United States v. Hull,* 419 F.3d 762 (8th Cir. 2005)..........................25

*United States v. Johnson,* 703 F.3d 464 (8th Cir. 2013)..........................32

*United States v. May,* 70 F.4th 1064 (8th Cir. 2023)...............................38

*United States v. Miner*, 544 F.3d 930 (8th Cir. 2008) ............................47

*United States v. Mohr,* 772 F.3d 1143 (8th Cir. 2014) ...............28, 29, 30

*United States v. Murdock,* 928 F.2d 293 (8th Cir. 1991).....................37, 38

*United States v. Rogers,* 73 F.3d 774 (8th Cir. 1996)..............................37

*United States v. Shumpert,* 889 F.3d 488 (8th Cir. 2018)........................37

*United States v. Sledge,* 108 F.4th 659 (8th Cir. 2024) ..........................43

*United States v. Toothman*, 543 F.3d 967 (8th Cir. 2008)........................48

*Wood v. Ercole,* 644 F.3d 83 (2d Cir. 2011).....................................29, 30

**Statutes**

18 U.S.C. § 1028A ...............................................................................5

18 U.S.C. § 1201 .................................................................................5

18 U.S.C. § 1344 .................................................................................5

18 U.S.C. § 3231 .................................................................................1

18 U.S.C. § 3553 ...........................................................3, 23, 46, 48

18 U.S.C. § 3742 .................................................................................1

28 U.S.C. § 1291 .................................................................................1

**Rules**

FRAP 4.................................................................................................1

FRAP 32.............................................................................................53

FRCrP 51.......................................................................................25, 47

FRCrP 52.......................................................................................33, 47

**Guidelines**

USSG § 4A1.3.............................................................................*passim*

# TABLE OF CITATIONS

| **Abbreviation** | **Description** |
|---|---|
| Def. Add. | Addendum to Brief of Defendant-Appellant |
| Final Conf. Tr. | Transcript of Final Pretrial Conference (R. Doc. 188) |
| FRAP | Federal Rules of Appellate Procedure |
| FRCrP | Federal Rules of Criminal Procedure |
| Gov. Ex. | Government Trial Exhibits |
| Mot. Ex. | Motion Hearing Exhibits (R. Doc. 44) |
| Mot. Tr. | Motions Hearing Transcript (R. Doc. 57) |
| PSR | Final Presentence Investigation Report (R. Doc. 149) |
| R. Doc. | Record Document of District Court (No. 22-cr-303(1) (D. Minn.)) |
| Sent. Tr. | Transcript of Sentencing Hearing (R. Doc. 194) |
| SOC | Statement of the Case |
| Trial Tr. | Transcript of Jury Trial ((Vol. #):Trial Tr.) (R. Doc. 190, 191, 193) |
| Voir Dire Tr. | Transcript of Jury Selection (R. Doc. 189) |
| USSG | United States Sentencing Guidelines |

# JURISDICTIONAL STATEMENT

In the criminal case at issue here, Defendant-Appellant Raphael Nunn was charged by indictment filed in United States District Court for the District of Minnesota ("district court"), No. 22-cr-303(1) (docket entries cited herein as "R. Doc."). Criminal offenses against the United States ("government") were alleged, (R. Doc. 14 (original indictment); R. Doc. 77 (superseding indictment)), thereby triggering the original jurisdiction of the district court, 18 U.S.C. § 3231.

The Honorable Dulce J. Foster, United States Magistrate Judge, presided over a pretrial motions hearing, (R. Doc. 43), later issuing an Order and Report-and-Recommendation ("R&R"), (R. Doc. 51 (Order); R. Doc. 52 (R&R); Def. Add., at 8-27). The Honorable Eric C. Tostrud, United States District Judge, adopted both the Order and R&R, (R. Doc. 59; Def. Add., at 28-33), and presided over the remaining proceedings relevant to this appeal, including pretrial hearings, (R. Doc. 72, 124), jury trial, (R. Doc. 127, 129, 131, 132, 133), and sentencing, (R. Doc. 165).

After a jury verdict and sentencing, the district court entered a judgment of conviction on November 27, 2024. (R. Doc. 168; Def. Add., at 1-7). A notice of appeal was filed on December 9, 2024, (R. Doc. 171), which is timely under FRAP 4(b)(1)(A)(i). This Court has jurisdiction to adjudicate the instant appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

# STATEMENT OF THE ISSUES

This is an appeal from a criminal judgment following jury trial, by which Defendant-Appellant Mr. Nunn was convicted of federal offenses based upon three separate incidents involving unidentified perpetrators. Three issues are presented:

*Issue I.*

Mr. Nunn had been arrested, interrogated, and held in custody for a full week, during which he was cooperative with law enforcement. In a second round of *Miranda*-warned custodial interrogation, he felt compelled to admit less-serious unlawful activity to absolve himself of more-serious law enforcement accusations, and uttered the phrase "I think I should get a lawyer." The issue is whether, under these circumstances, Mr. Nunn's utterance constituted an unambiguous invocation of the *Miranda* right to counsel, requiring the interrogation to cease and triggering the exclusionary rule as to post-invocation statements.

*Davis v. United States,* 512 U.S. 452 (1994)
*Smith v. Illinois,* 469 U.S. 91 (1984)
*Edwards v. Arizona,* 451 U.S. 477 (1981)
*Miranda v. Arizona,* 384 U.S. 436 (1966)

(cont'd next page)

*Issue II.*

At trial and without prior notice, the government presented a witness who made a surprise in-court identification of Mr. Nunn as an unidentified perpetrator previously described as African-American, with Mr. Nunn conspicuously seated as the only African-American at defense counsel table. The witness had not gotten a good look at the suspect at the time of the crime; had not provided detailed description at the time of the crime; and more than two years had passed since the crime. The issue is whether this in-court identification procedure was unnecessarily suggestive and gave rise to a substantial likelihood of misidentification, in violation of the Due Process Clause.

*Sexton v. Beaudreaux,* 585 U.S. 961 (2018)
*Neil v. Biggers,* 409 U.S. 188 (1972)
*Foster v. California,* 394 U.S. 440 (1969)


*Issue III.*

Whether the 288-month sentence imposed upon Mr. Nunn is greater than necessary to meet the statutory purposes of federal sentencing, and is thus substantively unreasonable; and whether the alternative upward departure similarly lacks sufficient justification in the record.

*Gall v. United States*, 552 U.S. 38 (2007)
18 U.S.C. § 3553(a)
USSG § 4A1.3(a)

# STATEMENT OF THE CASE[1]

The main focus of this Statement of the Case ("SOC") concerns those portions of the district court record, ("R. Doc."), which are most relevant to the issues presented to the Court as listed above. The pertinent factual background follows:

## A.    Charged Offenses

In a series of charging documents, the government alleged that Mr. Nunn had committed offense conduct, summarized in reverse-chronological order as follows:

| Date | Alleged Acts | Shorthand |
|------|-------------|-----------|
| 9/13/2022 | Allegedly: (i) kidnapped victim SE at gunpoint; (ii) coerced SE to drive to a bank automated teller machine (ATM) and to withdraw money using her payment cards; and (iii) carried away said money after having released SE. | "SE Kidnapping" |
| 8/9/2022 | Allegedly stole wallet of victim JT containing payment card, then used stolen card to purchase items from merchants in Minnesota. | "JT Theft" |
| 1/8/2022 | Allegedly robbed victim CL of her payment cards at gunpoint in Wisconsin, then used said cards to purchase items from merchants in Minnesota. | "CL Robbery" |
| (R. Doc. 2 (complaint and affidavit); R. Doc. 14 (original indictment); R. Doc. 77 (superseding indictment)). | | |

---

[1] Abbreviations contained within parenthetical citations to the record are described in the text, as well as within the Table of Citations above.

Though the charged conduct was purported to have occurred on different occasions and under varied circumstances as above, the government opted to charge Mr. Nunn in one single indictment:

| Offense | Charge(s) |
|---|---|
| SE Kidnapping | Count 1: Kidnapping, 18 U.S.C. § 1201(a)(1)<br><br>Willfully "seize[d]" SE and "held her for his own benefit and purpose," by means of interstate commerce, *i.e.,* automobile and interstate highways. |
| JT Theft | Count 2: Bank Fraud, 18 U.S.C. § 1344<br><br>After having allegedly stolen JT's wallet containing payment card, used said card to purchase items at Minnesota merchants while "falsely representing the card as his own and omitting the material fact that the card was stolen," for a loss to financial institution of $430.59.<br><br>Count 4: Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1)<br><br>Used "means of identification," *i.e.,* name and card account number, during and in relation to above bank fraud. |
| CL Robbery | Count 3: Bank Fraud, 18 U.S.C. § 1344<br><br>After having allegedly robbed CL of purse containing payment cards, used said cards to purchase items at Minnesota merchants while "falsely representing the cards as his own and omitting the material fact that the cards were stolen," for a loss to financial institutions of $36.08 and $145.16.<br><br>Count 5: Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1)<br><br>Used "means of identification," *i.e.,* name and card account numbers, during and in relation to above bank fraud. |
| (R. Doc. 77 (superseding indictment)) | |

### B. Pretrial Motions

#### 1. Defendant Motions

Mr. Nunn filed a number of pretrial motions, including a motion to sever the charged counts for trial, (R. Doc. 38), and to suppress statements elicited by means of custodial interrogation. (R. Doc. 39). As to the latter, the statement at issue ("Defendant Statement" or "Statement") was elicited on September 29, 2022, while Mr. Nunn was being held in official custody based upon state charges involving the SE Kidnapping allegations. (*See, e.g.,* R. Doc. 42, at 3-4). The stated basis for the motion to suppress was that, during the custodial interrogation, Mr. Nunn had invoked his *Miranda* right to counsel such that the interrogation should have ceased; however, law enforcement continued the interrogation, such that any post-invocation statements must be suppressed under the *Miranda* exclusionary rule. (R. Doc. 39; R. Doc. 42, at 3-4).

#### 2. Motions Hearing

The district court conducted a motions hearing. (R. Doc. 43), which is reflected in an official transcript, (R. Doc. 57 ("Mot. Tr.")). No witness testimony was presented at the hearing; rather, the parties stipulated to submission of two exhibits ("Mot Ex."). (Mot. Tr., at 5-6). It was agreed the parties would submit supplemental briefing as to the above pretrial motions. (Mot. Tr., at 4). One of these exhibits constituted a video recording of the custodial and law-enforcement-elicited

Defendant Statement. (Mot. Tr., at 5-6; Mot. Ex. 2; R. Doc. 44 (exhibit list)). Relevant portions of that Statement are summarized next.

### 3.     Defendant Statement

Based upon the SE Kidnapping allegations, Mr. Nunn had already been in law enforcement custody and subjected to a round of custodial questioning as of September 21, 2022. (1:Trial Tr., at 175-76, 184-85). In connection with those same allegations, he was charged with Minnesota state robbery and kidnapping offenses and made a first appearance in Minnesota state court on September 23, 2022. (R. Doc. 12, at 6). The challenged Defendant Statement was elicited on September 29, 2022, by a Hudson, Wisconsin law enforcement officer, who was investigating the CL Robbery of January 2022. (2:Trial Tr., at 399-401, 445-47).

The recording begins by showing Mr. Nunn sitting in a secure interrogation room, head in hands and mumbling responses to introductory law enforcement queries. (Mot. Ex. 2, at 00:30 to 02:05). Law enforcement conveyed a *Miranda* warning, including the right to consultation with counsel upon invocation. (*Id.*).

During the subsequent interrogation, law enforcement pressed Mr. Nunn about: his whereabouts at the time of the January 2022 robbery; the vehicle he was regularly driving at the time; and merchant surveillance recordings of the person using stolen payment cards associated CL Robbery. (Mot. Ex. 2, at 02:30 to 10:40).

Law enforcement interrogators attempted to extract a confession that Mr. Nunn was the person who committed the robbery act, and in relevant part Mr. Nunn stated:

> LE: [Y]ou don't remember doing this?
>
> RN: I, no, didn't rob no woman.
>
> LE: Then who did?
>
> DEF: I didn't rob nobody. * * * ***Listen, I think I should get a lawyer dude because*** * * *
>
> LE: ***O.K.***
>
> DEF: I used cards, I'll admit that.
>
> LE: O.K.
>
> DEF: I used the cards. I purchased the cards at a gas station.* * *

(Mot. Ex. 2, at 12:15 to 12:45 (emphases added)). The interrogation then continued for approximately twenty minutes, eliciting statements from Mr. Nunn that were later used against him at trial. (Mot. Ex. 2, at 12:45 to 33:33; R. Doc. 42, at 3-4).

### 4.    Ruling

Following the hearing and briefing by both parties, (R. Doc. 46, 47), the district court issued an order as to the motion to sever, as well as report and recommendation ("R&R") as to the motion to suppress. (R. Doc. 51 (order); R. Doc.

52 (R&R); Def. Add., at 8-27).[2] The R&R made factual findings consistent with the above. (R. Doc. 52, at 1-5, Def. Add., at 18-22). The R&R further acknowledged the rule requiring that law enforcement interrogation cease upon the accused's invocation of his *Miranda* right to counsel. (R. Doc. 52, at 4-5; Def. Add., at 21-22).

However, the R&R opined that under the circumstances presented here, Mr. Nunn had not adequately or unequivocally invoked his *Miranda* right to counsel. (R. Doc. 52, at 4-5; Def. Add., at 21-22). Mr. Nunn filed objections to the R&R, (R. Doc. 53), but the district court issued an order overruling said objections, adopting the R&R in full, and denying the motion to suppress, (R. Doc. 59, at 4-6; Def. Add., at 31-33). The case then proceeded toward jury trial, including additional pretrial proceedings described next.

## C. Final Pretrial Conference

As the trial date approached, the parties filed a number of motions in limine and other pretrial filings. (R. Doc. 89, 90, 93, 98, 106, 113, 114, 115, 116). The government's trial brief noted one anticipated in-court identification witness, *i.e.,* Mr. Nunn's probation officer, who was expected to identify Mr. Nunn as the person

---

[2] The order and R&R appear to be identical. (*Compare* R. Doc. 51, *with* R. Doc. 52; Def. Add., at 8-27). The district court docket report refers to the two as separate entries, designating one as an order concerning the motion to sever, (R. Doc. 51), and the other as a R&R concerning the motion to suppress, (R. Doc. 52). The district court's order adopting both the order and R&R follows the same convention. (R. Doc. 59, at 5-6; Def. Add., at 32-33).

depicted in surveillance recordings associated with the SE Kidnapping incident. (R. Doc. 104, at 19-20).

The trial brief also mentioned evidence of a "concerned citizen" who had purportedly recognized and identified Mr. Nunn from a law enforcement press release. (R. Doc. 104, at 4, 16-17). The defense responded with a motion in limine seeking to exclude the "concerned citizen" statement from trial as an improper out-of-court identification, under a number of grounds. (R. Doc. 116). The defense also filed its own trial brief, noting: "The defense does not anticipate that there will be an in-court identification of Mr. Nunn by the complainants." (R. Doc. 125, at 1).

These and other matters were addressed at a Final Pretrial Conference, (R. Doc. 124), which is reflected in an official transcript, (R. Doc. 188 ("Final Conf. Tr.")). The proposed "concerned citizen" evidence was discussed, and the government committed to limiting the evidence to omit any out-of-court identification content, which resolved the bulk of defense objections and prompted the court to defer further rulings for trial. (Final Conf. Tr., at 3-5, 36-43). The district court later issued a written order on the pretrial evidentiary motions. (R. Doc. 126; Def. Add., at 34-43).

### D.     Jury Trial

The case then proceeded to jury trial proceedings, (R. Doc. 127, 129, 132, 133), memorialized within official transcripts, including a voir dire transcript,

(R. Doc. 189 ("Voir Dire Tr.")), and several volumes of trial transcripts, (R. Doc. 190 (Vol. 1); R. Doc. 191 (Vol. 2); R. Doc. 193 (Vol. 3) (hereinafter cited in format "(Vol. #):Trial Tr., at (pg. #)"). Consistent with the charging document, the trial presentation involved three factual episodes, as follows:

## 1.  SE Kidnapping

With respect the SE Kidnapping incident, the government's evidentiary presentation may be summarized as follows:

*(a). Account of SE.* The government first presented the testimony of victim SE. (1:Trial Tr., at 49-51). On the morning of September 13, 2022, SE drove her personal Lexus vehicle to her employer's parking area in Arden Hills, Minnesota. (1:Trial Tr., at 52-53). Upon exiting the vehicle, she was accosted by an unidentified man (UI-1), wearing a mask and carrying what appeared to be a firearm. (1:Trial Tr., at 54-55). UI-1 ordered SE back into the driver's compartment of the vehicle, took a seat in the rear passenger area directly behind SE, and ordered her to drive an intra-state highway route to a neighborhood of Minneapolis, Minnesota. (1:Trial Tr., at 55-59).

At that point UI-1 ordered SE to stop the vehicle and produce the payment cards from her wallet, associated with Wells Fargo Bank. (1:Trial Tr., at 59-60). UI-1 then directed SE to drive to nearby Wells Fargo branch bank with an ATM drive-up lane, and caused SE to draw cash from accounts associated with the cards; after

a number of attempts and return trips, eventually SE succeeded in withdrawing $1,500 in cash from the ATMs, which she turned over to UI-1 who remained seated behind her. (1:Trial Tr., at 60-69).

After this, UI-1 commanded SE to drive the vehicle to a nearby park, instructed her to exit the vehicle, and informed her that he would drive the vehicle to the other side of the park where she could retrieve it upon walking a good distance. (1:Trial Tr., at 70-72). In this manner SE eventually reached her Lexus vehicle, which was found to contain her mobile phone, by which she contacted emergency services. (1:Trial Tr., at 71-74).

At the scene and again at trial, SE provided only a "very general" description of UI-1, *i.e.*: "He was wearing a mask, a hat, long sleeves, long pants. He was African-American. He was slightly shorter than I am, stocky." (1:Trial Tr., at 54, 74, 201). During the encounter, SE purposefully avoided looking at UI-1. (1:Trial Tr., at 75, 81-82).

*(b). Surveillance Tracing.* In the subsequent investigation, law enforcement "canvassed" the neighborhood in an effort to trace UI-1's movements after exiting the Lexus, *i.e.,* law enforcement requested that private businesses and/or residents in the area voluntarily provide recordings from private surveillance camera systems. (1:Trial Tr., at 89-90, 93-95). Law enforcement obtained video recordings showing SE's Lexus coming to a stop at the place where it was eventually recovered, with

masked UI-1 departing from the vehicle. (1:Trial Tr., at 98-101). Using SE's general description and that first surveillance recording of UI-1 exiting the Lexus as a guide, law enforcement attempted to obtain additional surveillance recordings to trace what was presumed to be UI-1's walking path from the Lexus. (1:Trial Tr., at 101-38).

It was acknowledged this technique requires law enforcement to make subjective judgments based upon the general manner of "clothing, stature, race, [and] ethnicity" of UI-1. (1:Trial Tr., at 93-94, 104-05, 110-11, 114-15, 118). It was further acknowledged the surveillance recordings were of varying clarity, and in some cases "grainy." (1:Trial Tr., at 97, 134). It was further acknowledged the investigative technique did not purport to offer a continuous record of UI-1's movements and footpath, but rather there were significant spatial gaps where no surveillance or other recordings of UI-1's movements could be found. (1:Trial Tr., at 179-80). The gaps—including a particularly large gap between Cameras 1-9 at the beginning of the presumed UI-1 footpath and Camera 10 at the hypothesized terminus—are depicted in the government's exhibit which mapped the locations of surveillance cameras used for the tracing technique:



Cameras 1-9:
Hypothesized Start

Camera 10:
Hypothesized Terminus

Cedar A

E 25th St

26th Ave S

27th Ave S

E 26th St

Largest Spatial Gap

(Gov. Ex. 2A (captions added); 1:Trial Tr., at 95). Under this law enforcement theory: UI-1 exited the Lexus and walked on foot for a distance, all of which was captured on video surveillance from Cameras 1-9; video surveillance lost track of UI-1 for a long distance over a densely-populated urban area and across a busy highway; but law enforcement believed it was able to use surveillance recordings to find UI-1 at the terminus of his theorized footpath, believed to be the place associated with Camera 10. (Gov. Ex. 14; 1:Trial Tr., at 154-56).

That place, explained law enforcement witnesses, was a commercial establishment called Cedar Food and Grill ("Cedar Food"). (1:Trial Tr., at 154-57). From that establishment, law enforcement obtained what was presumed to be

surveillance recordings of UI-1 entering and inside the store, with no mask concealing the suspect's face. (1:Trial Tr., at 156-57).

*(c). Mis-Identification of UI-1.* Law enforcement consulted with Cedar Food staff in an effort to ascertain the identity of (theorized) UI-1 depicted on store surveillance. (1:Trial Tr., at 158). On September 16, 2022, Cedar Food employees reported to law enforcement that UI-1 had returned to the store, and law enforcement took a photo of this suspect, later identified as Jerrill Lee. (1:Trial Tr., at 157-59). Law enforcement concluded this photo "matched the physical description [of UI-1]." (1:Trial Tr., at 158). On this basis, law enforcement then: conducted a traffic stop of Lee's vehicle; arrested Lee; interrogated Lee; and searched Lee's residence. (1:Trial Tr., at 158-61, 180-84). In the end, law enforcement eventually "cleared" Lee of being UI-1 associated with the SE Kidnapping. (1:Trial Tr., at 183).

*(d). Arrest of Mr. Nunn.* The next day—September 17, 2022—Cedar Food employees made a second attempt at identifying UI-1, providing law enforcement with surveillance recordings of a person later identified as Mr. Nunn, entering the store. (1:Trial Tr., at 167-70). Law enforcement trained its focus on Mr. Nunn as its new primary suspect, and eventually arrested him outside of his residence. (1:Trial Tr., at 171-76). As with mis-identified Lee the day before, law enforcement conducted a custodial interrogation of Mr. Nunn in connection with the SE Kidnapping allegations. (1:Trial Tr., at 176).

At trial, a state probation officer who had become familiar with Mr. Nunn's features offered a positive identification of the Mr. Nunn being the person depicted in Cedar Food surveillance recordings of September 13, 2022, as well as an in-court identification of Mr. Nunn as he sat at counsel table during trial proceedings. (1:Trial Tr., at 191-96). In addition, the government's DNA-identification expert reported that swabs from the Lexus revealed a "moderate" match with Mr. Nunn's DNA profile. (2:Trial Tr., at 316, 323, 325-26).

Law enforcement conducted a search-and-seizure operation at Mr. Nunn's residence (where he resided with his nephew), resulting in the seizure of: clothing that was claimed to be consistent with the surveillance recordings of UI-1; a revolver-style starter pistol; and identification and payment cards associated with third parties, including JT (associated with the charged JT Theft) and CL (associated with the charged CL Robbery). (1:Trial Tr., at 209-31; 2:Trial Tr., at 334-46). The evidentiary presentations concerning these latter incidents are described next.

### 2. JT Theft

*(a). Account of JT.* JT testified that she is employed with a Minnesota orthopedics company, traveling to and performing duties at different branches. (2:Trial Tr., at 469-70). On August 9, 2022, JT was working at her company's facility located in Oak Park Heights, Minnesota; and was stationed at an internal office where she had placed a backpack containing numerous items, including a

wallet containing payment cards associated with personal financial accounts. (2:Trial Tr., at 471-84).

JT left her work area for a brief time, and upon her return noticed the backpack was missing. (2:Trial Tr., at 474-75). Later, JT discovered that her payment cards had been used at two Minnesota retail stores without her permission, before she was able to cancel them. (2:Trial Tr., at 484-90).

*(b). Surveillance Tracing.* Oak Park Heights law enforcement investigated the incident, using a similar surveillance tracing technique as related above. (2:Trial Tr., at 492-97). In this instance, law enforcement obtained internal surveillance recordings from JT's employer, which revealed what appeared to be an unidentified man (UI-2)—described as a masked "African-American male wearing a gray golfer-style hat, T-shirt, blue sleeves, * * * gray or darker pair of pants, and white shoes"— taking what appeared to be JT's backpack from the office and out the building exit. (2:Trial Tr., at 497-511).

Later, law enforcement obtained video surveillance recordings from the Minnesota stores where JT had reported unauthorized use of her payment cards; the resultant video recordings revealed a person matching the above description of UI-2, making unauthorized use of JT's payment cards. (2:Trial Tr., at 511-32).

*(c). Mis-Identification of UI-2.* Using the above video recordings, Oak Park Heights law enforcement dispatched a "crime alert" to nearby law enforcement

agencies, seeking leads as to the identity of UI-2. (2:Trial Tr., at 528-33). Responses were returned, indicating that an individual called Leon Lasley was the likely identity of UI-2. (2:Trial Tr., at 533). Oak Park Heights law enforcement examined a photo of Lasley, and concluded this person was the same as the UI-2 depicted in the surveillance recordings. (2:Trial Tr., at 533). Law enforcement prepared a report expressing "certainty" that UI-2 and Lasley were one in the same, and a warrant was filed authorizing Lasley's arrest. (2:Trial Tr., at 534-35, 537). However, the warrant was eventually cancelled, based upon the challenged Defendant Statement above in connection with the CL Robbery investigation, detailed next. (2:Trial Tr., at 534-35).

### 3. CL Robbery

*(a). Account of CL.* CL related that she had been the victim of a robbery on January 8, 2022, in the parking area of a retail store located in Hudson, Wisconsin. (2:Trial Tr., at 359-62). On that date, said CL, she had just entered her vehicle and was set to depart with her shopping items, when she was suddenly confronted by a man armed with a gun. (2:Trial Tr., at 361-72). The unidentified man (UI-3) held the gun to CL's head and demanded her purse—which contained her wallet, cash, payment cards, and mobile phone—and CL complied. (2:Trial Tr., at 370-72). UI-3 then departed in his own vehicle, at which time CL sought aid from fellow shoppers and eventually law enforcement. (2:Trial Tr., at 373-75).

CL reported unauthorized use of her stolen payment cards at Minnesota stores. (2:Trial Tr., at 379-91). In addition, the purse that UI-3 had taken contained CL's mobile phone, which continued to provide location information which CL would access from time to time, and periodically report to law enforcement. (2:Trial Tr., at 375-77).

(b). *Surveillance Tracing.* As with the above incidents, Hudson law enforcement investigated the incident using surveillance recordings. (2:Trial Tr., at 373-75). In this instance, law enforcement first took CL's statement, which included a "very broad description of the suspect," *i.e.,* "black male, anywhere from his 30s to 40s, medium build." (2:Trial Tr., at 402). After this, law enforcement obtained surveillance recordings of the parking area, which revealed that UI-3 had been wearing "a gray hooded sweatshirt, dark-colored pants, a dark-colored vest, some type of hat, and appears to have a white mask on." (2:Trial Tr., at 410).

As above, law enforcement then procured video surveillance recordings of the individual who had made the unauthorized purchases from Minnesota stores, using CL's payment cards. (2:Trial Tr., at 414-33). In law enforcement's judgment, the person depicted in the recordings was one in the same as UI-3 from the robbery recordings. (2:Trial Tr., at 418; *accord, e.g.,* 2:Trial Tr., at 420, 429, 430).

Having gathered the above surveillance recordings, Hudson law enforcement assembled still photos and dispatched a crime alert to nearby law enforcement

agencies, similar to the JT Theft investigation above. (2:Trial Tr., at 434-35). Subsequently, Hudson law enforcement took a number of additional steps, including: reviewing the Oak Park Heights crime alert and suspect Lasley; tracing the vehicle UI-3 had been driving to a Saint Paul, Minnesota address; and eventually learning of the SE Kidnapping with Mr. Nunn as a suspect in connection therewith. (2:Trial Tr., at 435-45). Hudson law enforcement then elicited the disputed Defendant Statement, involving use of CL's payment cards to purchase items (having reportedly purchased them from an unidentified person at a gas station), and identified himself as the masked individual depicted in surveillance images concerning both the CL Robbery and JT Theft. (2:Trial Tr., at 444-51).

*(c). In-Court Identification.* Unlike Victims SE or JT, Victim CL made an in-court identification of Mr. Nunn as the UI-3 who had committed Hudson Robbery:

> CL. I looked and I noticed that it was a man with a gun, and I screamed and I started kicking my feet and I had turned my body towards the man * * * when the door opened.

> GOV. Let's talk about that for a second. So you were turned to your right placing your purse on the front passenger seat, is that right?

> CL. Correct.

> GOV. And then when the door behind you opened, that's when you then turned to your left, is that right?

> CL. Correct. And it was my driver's side door, correct.

GOV. Your driver's side door. Thank you for that clarification. Were you looking at the man who opened your driver's side door face-to-face when that door opened?

CL. Yes, I was looking directly at him because I had turned my body to the left (indicating).

GOV. Can you describe that man as best as you can?

CL. I can see him. That's the man that it was.

GOV. [You] just indicated that you can see the man who opened your driver's side door, is that correct?

CL. Yes.

GOV. Can you please point that person out in the courtroom by their position in the courtroom and an article of clothing.

CL. The gentleman is sitting at this table right here (indicating) * * *.

GOV: Your Honor, may the record reflect that [CL] has identified the defendant, Raphael Raymond Nunn, as the man who opened her door on January 8th of 2022?

COURT: It may.

(2:Trial Tr., at 369-70).

However, CL also stated the events "all happened very quickly." (2:Trial Tr., at 372). Further, as already noted, at the time of the robbery CL had only provided Hudson law enforcement with a "very broad description of the suspect," *i.e.,* "black male, anywhere from his 30s to 40s, medium build." (2:Trial Tr., at 402). Also as already noted, every surveillance recording involving the incident depicted UI-3 as donning a mask, which was not mentioned by CL in her in-court identification.

(2:Trial Tr., at 418, 420, 429, 430). The government's pretrial papers were inconsistent on the matter, sometimes describing UI-3 as wearing a mask during the CL Robbery and sometimes saying the person was unmasked. (*Compare* R. Doc. 42, at 3 (describing UI-3 as "a masked male fitting Mr. Nunn's description"), *with* R. Doc. 104, at 8 (describing UI-3 as "an unmasked black man")). At sidebar, defense counsel expressed surprise by the in-court identification, and the government responded that it had privately calculated the chances of CL's in-court identification as "50/50." (2:Trial Tr., at 458-59).

### E.     Verdict

In closing arguments, the government offered its theory that Mr. Nunn was one-in-the-same as UI-1, UI-2, and UI-3. (3:Trial Tr., at 615-16). For support, the government relied heavily upon both the Defendant Statement and CL's in-court identification. (3:Trial Tr., at 633-34, 651-52). The jury returned guilty verdicts as to all the charged counts, and the district court referred the matter for sentencing proceedings described next. (3:Trial Tr., at 673-77).

### F.     Sentencing

The district court's probation office prepared a presentence investigation report, (R. Doc. 149 ("PSR")), which recounted the above evidence presented at trial and also Mr. Nunn's criminal history, to arrive at an advisory sentencing range under the United States Sentencing Guidelines (USSG). The PSR determined the advisory

USSG range was 168 to 210 months, plus a 24-month mandatory consecutive term under Counts 4 and 5. (PSR, at 26, ¶¶ 117-18). The district court conducted a sentencing hearing, (R. Doc. 165), reflected in an official transcript, (R. Doc. 194 ("Sent. Tr.")). During that hearing, the district court overruled defense objections to PSR sentencing calculations, and adopted the PSR in full. (Sent. Tr., at 9-12; R. Doc. 170 ("Am. SOR"), at 1).

The defense noted Mr. Nunn's age (58 years old at time of sentencing) and disadvantaged background, and requested a sentence at or below the advisory range. (Sent. Tr., at 28-36). However, at the government's urging, the district court varied above the USSG range and imposed a 264-month prison term as to Counts 1-3, plus a mandatory-consecutive 24 months as to Counts 4-5, for a combined 288-month term of imprisonment. (Sent. Tr., at 37). For its rationale, the district court cited the circumstances of the offense conduct, the impact upon the victims, and Mr. Nunn's criminal record, to impose an upward-variance sentence under 18 U.S.C. § 3553(a); and alternatively, reaching the same outcome as an under-representative criminal history under USSG § 4A1.3(a). (Sent. Tr., at 40-46; Am. SOR, at 4). The district court then entered a sentencing judgment, (R. Doc. 168, at 2-3; Def. Add., at 2-3), from which Mr. Nunn filed a timely notice of appeal, (R. Doc. 171), initiating this direct appeal which raises the following arguments for the Court's consideration:

# SUMMARY OF THE ARGUMENT

This is an appeal from a federal conviction, following a jury trial and guilty verdict. Mr. Nunn respectfully requests that the Court vacate the conviction:

*Issue I.* Mr. Nunn had been arrested, interrogated, and held in custody for a full week, during which he was cooperative with law enforcement. In a second round of *Miranda*-warned custodial interrogation, he felt compelled to admit less-serious unlawful activity to absolve himself of more-serious law enforcement accusations, and uttered the phrase "I think I should get a lawyer." Under the circumstances, this constituted an unambiguous invocation of the *Miranda* right to counsel.

*Issue II.* At trial and without prior notice, the government presented a witness who made a surprise in-court identification of Mr. Nunn as an unidentified perpetrator previously described as African-American, with Mr. Nunn conspicuously seated as the only African-American at defense counsel table. The witness had not gotten a good look at the suspect at the time of the crime; had not provided detailed description at the time of the crime; and more than two years had passed since the crime. The in-court identification procedure was unnecessarily suggestive and gave rise to a substantial likelihood of misidentification, in violation of the Due Process Clause.

*Issue III.* Given the overall record, the sentence imposed was overly severe and unreasonable, under the rationales offered by the district court.

# ARGUMENT

**I.** **Mr. Nunn had invoked his *Miranda* right to counsel during the course of custodial interrogation, triggering the *Edwards* rule requiring that interrogation cease, such that the exclusionary rule required suppression of the post-invocation portion of the Defendant Statement.**

The district court denied Mr. Nunn's pretrial motion to suppress the portion of the Defendant Statement which had been elicited by law enforcement following Mr. Nunn's "I think I should get a lawyer" utterance during custodial interrogation; reasoning the invocation was insufficiently "unequivocal." (R. Doc. 59; Def. Add., at 28-33). This ruling presents a faulty application of law to fact, requiring reversal and remand for a new trial—

## A. Standard of Review

Mr. Nunn had filed a pretrial motion to suppress the post-invocation portion of the Defendant Statement under the *Miranda* exclusionary rule. (R. Doc. 39). The R&R suggested denial of the motion, (R. Doc. 52, at 10; Def. Add., at 27), which the district court adopted over Mr. Nunn's objections, (R. Doc. 59, at 1, 4-6; Def. Add., at 28, 31-33). Hence, the issue has been fully preserved for this Court's review. FRCrP 51(b). Under such circumstances, the issue presents a mixed question of law and fact, reviewed under the independent *de novo* standard when the pertinent facts are undisputed as here. *United States v. Hull,* 419 F.3d 762, 767 (8th Cir. 2005).

## B.  Principles of Law

Under the rule of *Miranda v. Arizona*, law enforcement is required to advise a suspect of his right to assistance of counsel prior to custodial interrogation; and if the suspect requests assistance of counsel "the interrogation must cease." 384 U.S. 436, 474 (1966). A suspect's invocation of the *Miranda* right to counsel requires law enforcement to cut off questioning, unless the accused initiates further communication. *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981).

The *Miranda-Edwards* rule is triggered upon the accused's utterance of "some statement that can reasonable be construed to be an expression of a desire for the assistance of an attorney"; but is not triggered by a "reference to an attorney that is ambiguous or equivocal." *Davis v. United States,* 512 U.S. 452, 459 (1994). "Although a suspect need not speak with the discrimination of an Oxford don * * * he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer *in the circumstances* would understand the statement to be a request for an attorney." *Id.* (cleaned up & emphasis added). To make the ambiguity or non-ambiguity determination, courts examine both "the request for counsel" and "the circumstances leading up to the request." *Smith v. Illinois,* 469 U.S. 91, 98 (1984).

Once the person in custody has invoked the *Miranda-Edwards* right to counsel, "the police may not further interrogate the defendant until counsel has been

made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." *Holman v. Kemna,* 212 F.3d 413, 417 (8th Cir. 2000) (cleaned up). Waiver of said invocation "cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.*

### C. Application to Case

In this case, Mr. Nunn: was arrested in connection with state charges involving the SE Kidnapping allegations on September 21, 2022; had been cooperative with law enforcement investigation efforts, including a first round of custodial interrogation; and had made a first appearance in Minnesota state court on September 23, 2022. (SOC § B.3). The custodial interrogation at issue here occurred on September 29, 2022—more than a week after Mr. Nunn's arrest and ongoing custody. (SOC § B).

Mr. Nunn's mid-interrogation utterance requesting counsel must be viewed in light of these "circumstances leading up to the request." *Smith,* 469 U.S. at 98. He had been cooperative with law enforcement throughout that time, answering law enforcement questions and offering information in an effort to absolve himself of law enforcement's claims that he had committed acts of violence. This supplies the crucial context for Mr. Nunn's key remarks at issue:

LE: [Y]ou don't remember doing this?

RN: I, no, didn't rob no woman.

LE: Then who did?

DEF: I didn't rob nobody. * * * ***Listen, I think I should get a lawyer dude because*** * * *

LE: ***O.K.***

DEF: I used cards, I'll admit that.

LE: O.K.

DEF: I used the cards. I purchased the cards at a gas station.* * *

(Mot. Ex. 2, at 12:15 to 12:45 (emphases added)).

These are words of a man who wishes to offer an explanation in the face of law enforcement accusations, aware that the explanation is not fully innocent but not nearly so culpable as law enforcement supposes. His words show a man who acknowledged being out of his depth in this complicated scenario, and required the assistance of counsel. In short, under the circumstances, this was an unambiguous and unequivocal invocation of the *Miranda* right to counsel.

The district court reached a contrary conclusion, relying upon this Court's decision in *United States v. Mohr,* involving the following factual scenario:

> Mohr asserts that as he was walking into the interview room he asked his probation officer, "Should I get a lawyer at this time? ... I think I should get one."

772 F.3d 1143, 1145 (8th Cir. 2014). This Court held that, assuming the defendant's version of events be true, "Mohr's statement 'I think I should get a lawyer' was not

an unequivocal invocation of his right to counsel." *Id.* at 1146 (cleaned up). The district court accepted the government's argument that mere similarity of words uttered by the *Mohr* defendant and Mr. Nunn here was dispositive. (R. Doc. 59, at 4-5; Def. Add., at 31-32). Such reasoning is unsound, however, as literal words divorced from surrounding circumstances will obscure meaning. Doubtless this is why in the *Miranda* invocation inquiry, the Supreme Court requires inquiry into "the circumstances leading up to the request," rather than merely the wording of the request itself. *Smith,* 469 U.S. at 98.

For example, in *Wood v. Ercole,* the Second Circuit encountered a situation where a defendant had been arrested based upon suspected participation in a murder-for-hire scheme, held in custody for more than 24 hours, and acquiesced to various interrogation techniques up until the moment that law enforcement suggested the statement be video-recorded. 644 F.3d 83, 91 (2d Cir. 2011). Only once the topic of video-recording had been raised did the suspect state: "I think I should get a lawyer." *Id.* Considering the quoted words within the above factual context, the Second Circuit held the situation constituted an unequivocal invocation of the *Miranda* right to counsel, such that the interrogation should have ceased and the post-invocation fruits suppressed under the exclusionary rule. *Id.* at 90-92. The reasoning: (i) the suspect had been held in custody for a lengthy stretch of time, and had cooperated with law enforcement for that lengthy period; (ii) however, once law enforcement

raised the topic of video-recording, the suspect's cooperative spirit changed abruptly; and (iii) under these circumstances, the utterance "I think I should get a lawyer" constituted an unequivocal invocation of his *Miranda* right to counsel. *Id.*

The circumstances in the case at hand are much closer to *Wood* than *Mohr.* As in *Wood*, Mr. Nunn was being held in custody for a lengthy period of time (over a week) and cooperated in one full round of custodial interrogation and part of another; he only invoked his *Miranda* right to counsel upon being confronted with a situation where he felt called upon to admit to one crime in order to absolve himself of what he considered a far more serious crime. As in *Wood,* under these circumstances his words are properly viewed as an unambiguous invocation of his right to counsel, triggering the *Miranda-Edwards* rule. In *Mohr*, by contrast, a parolee was questioned at his probation officer's office, and before doing so merely inquired about the advisability of consulting with counsel. 772 F.3d at 1145-46. In short, *Wood* is a far better guide than *Mohr* under the circumstances presented here.

Last, the district court ruled that even if Mr. Nunn had invoked his *Miranda* right to counsel, his subsequent responses to law enforcement interrogation qualified under *Edwards* as defendant-initiated "communication[s], exchanges, or conversations with the police." (R. Doc. 59, at 5; Def. Add., at 32). This too is incorrect, however, as: (i) law enforcement never ceased the questioning as is required by *Edwards*; (ii) defendant initiation and/or waiver of the *Miranda* right to

counsel is not shown by the defendant's continued responses to law enforcement questions; and (iii) law enforcement never took any action to confirm that Mr. Nunn wished to initiate further discussion with law enforcement and waive the invoked *Miranda* right to counsel, *e.g.,* re-administer the warning, confirm waiver of right to counsel, or the like. *Holman,* 212 F.3d at 419-20; *Owens v. Bowersox,* 290 F.3d 960, 964 (8th Cir. 2000).

### D.    Requested Remedy

When it is determined that law enforcement failed to cease custodial interrogation in violation of the *Miranda-Edwards* rule, the general remedy is an order to suppress the post-invocation statement. *See, e.g., Arizona v. Roberson,* 486 U.S. 675, 679 & 686-88 (1988) (affirming state court order suppressing post-invocation statement). In addition, the government used the Defendant Statement prominently at trial in order to secure the convictions, such that the error cannot be considered harmless. *United States v. Chamberlain,* 163 F.3d 499, 504 (8th Cir. 1998). Accordingly, Mr. Nunn respectfully requests that the Court reverse the district court's decision, remand for a new trial, and instruct that the district court enter an order suppressing the post-invocation portion of the Defendant Statement for purposes of a said trial. *Id.* at 505.

**II.** **The in-court identification procedure was impermissibly and unnecessarily suggestive, and in this case gave rise to a "substantial likelihood of irreparable misidentification" in violation of the Fifth Amendment Due Process Clause.**

During jury trial proceedings, the government elicited the testimony of Victim CL, who made an in-court identification of Mr. Nunn as UI-3 who had committed the January 2022 robbery. (2:Trial Tr., at 369-70). The defense was surprised by the in-court identification and renewed a motion to sever charged counts for trial, but did not move to suppress the in-court identification. (2:Trial Tr., at 398-99, 458-65). However, the in-court identification procedure was unnecessarily suggestive and unreliable, giving rise to an unacceptable risk of mis-identification in violation of the Fifth Amendment Due Process Clause.[3] The district court was thus required to suppress the in-court identification testimony even in the absence of a motion, as explained below.

### A. Standard of Review

The in-court identification testimony caught the defense by surprise, such that Mr. Nunn renewed his motion to sever counts on that basis; but did not move to suppress the testimony pursuant to the Due Process Clause, as contended now on

---

[3] Many of the Supreme Court cases cited herein involve the Fourteenth Amendment Due Process Clause applicable to state prosecutions, rather than the Fifth Amendment Due Process Clause applicable in federal prosecutions. However, "due process of law" has been held to have the same meaning in both contexts. *United States v. Johnson,* 703 F.3d 464, 469 n.4 (8th Cir. 2013).

appeal. (2:Trial Tr., at 398-99, 458-65). Under such circumstances, appellate courts generally apply FRCrP 52(b) plain-error review. *Greer v. United States,* 593 U.S. 503, 507 (2021). Plain-error review consists of four prongs:

(1). The defendant must show an non-waived "error" (meaning one that is not intentionally relinquished);

(2). that is "plain" (meaning clear or obvious under current law);

(3). while also "affect[ing] the defendant's substantial rights" (ordinarily meaning a reasonable probability that, but for the error, the outcome of proceedings would have been different);

(4). and when "those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings."

*Molina-Martinez v. United States,* 578 U.S. 189, 194 (2016).

## B. Principles of Law

The Due Process Clause "protect[s] against the admission of evidence deriving from suggestive identification procedures." *Neil v. Biggers,* 409 U.S. 188, 196 (1972). "It is the likelihood of misidentification which violates a defendant's right to due process," and thus suggestive identification procedures may require exclusion of said evidence from trial. *Id.* at 198. The Due Process Clause forbids eyewitness identification evidence that is tainted by an identification procedure which was both unnecessary and suggestive, *i.e.,* giving rise to "a very substantial likelihood of irreparable misidentification." *Sexton v. Beaudreaux,* 585 U.S. 961, 965-66 (2018) (citing, *e.g., Manson v. Brathwaite,* 432 U.S. 98 (1977)).

Applying Supreme Court precedents, this Court uses a two-step test:

(1). Determine whether the identification procedure(s) at issue were "impermissibly suggestive."

(2). If so, determine whether in the case at hand the procedures "created a very substantial likelihood of irreparable misidentification."

*United States v. Harper,* 124 F.4th 1094, 1099 (8th Cir. 2025) (cleaned up).

### 1.    Impermissibly Suggestive

An "impermissibly suggestive" identification procedure is one that unnecessarily "give[s] rise to a very substantial likelihood of irreparable misidentification." *Sexton,* 585 U.S. at 965. A long-recognized example is the single-suspect "show up" procedure. *Perry v. New Hampshire,* 565 U.S. 228, 237-38 (2012). "[T]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Foster v. California,* 394 U.S. 440, 443 (1969) (cleaned up).

### 2.    Likelihood of Misidentification

Even in the event of an unnecessarily suggestive identification procedure, suppression is not always required; rather the Due Process Clause calls for a case-by-case evaluation as to whether the challenged procedure "created a substantial likelihood of misidentification." *Sexton,* 585 U.S. at 966 (cleaned up). "Reliability of the eyewitness identification is the linchpin of that evaluation." *Id.* (cleaned up). The "reliability" question calls for examination of factors including:

*(i).*  Opportunity of the witness to view the suspect at the time of the crime;

*(ii).*  The witness's degree of attention;

*(iii).*  Accuracy of witness's prior description of suspect;

*(iv).*  Witness's level of certainty expressed at time of confrontation;

*(v).*  Amount of time between crime and confrontation.

*Id.* (cleaned up); *accord Harper,* 124 F.4th at 1099.

### C.  Application to Case

Applying the above principles to the case at hand under the plain-error standard requires evaluation of: (1) non-waived error; (2) current law; (3) substantial rights; and (4) judicial fairness and integrity. (§ II.A).

### 1.  Non-Waived Error

Pretrial proceedings had noted the importance of identity in the case, as well as any out-of-court or in-court identification evidence. (R. Doc. 104, at 19-20 (government trial brief noticing anticipated in-court identification witness); R. Doc. 116 (defense motion in limine regarding potential out-of-court identification evidence of "concerned citizen); R. Doc. 125, at 1 (defense trial brief noting "[t]he defense does not anticipate that there will be an in court identification of Mr. Nunn by the complainants.")). Victim CL's in-court identification testimony caught defense counsel by surprise. (2:Trial Tr., at 398-99, 458-65). For its part, the government was fully aware of a "50/50" chance that CL's in-court identification

testimony would occur. (2:Trial Tr., at 459-60). Forced to improvise, defense counsel renewed a motion to sever counts for trial, but did not specifically seek suppression of CL's in-court identification testimony under Due Process Clause principles. (2:Trial Tr., at 398-99, 458-65).

Given the surprise element of the in-court identification testimony and defense counsel's improvised efforts to craft a legal objection, the record demonstrates the Due Process argument presented here was inadvertently forfeited and not intentionally waived. *See, e.g., United States v. Combs,* 44 F.4th 815, 817-18 (8th Cir. 2022).

## 2. Current Law

As described above, the Due Process Clause test for suppression of unnecessarily suggestive identification evidence calls for an inquiry consisting of: (a) whether the challenged identification procedure was "impermissibly suggestive"; and (b) whether the challenged identification procedure did in fact "create a substantial likelihood of misidentification," as determined by applying the recognized "reliability" factors to the case-specific facts. (§ II.B).

### (a). Impermissibly Suggestive Procedure

An "impermissibly suggestive" identification procedure is one that unnecessarily "give[s] rise to a very substantial likelihood of irreparable misidentification." *Sexton,* 585 U.S. at 965. The classic example is the single-suspect

"show up" procedure. *Perry,* 565 U.S. at 237-38. One varietal occurs when, as here, the suspect is African-American, and the government presents a witness at trial who makes an in-court identification of the African-American defendant seated conspicuously at defense counsel table. *United States v. Davis,* 103 F.3d 660, 670-71 (8th Cir. 1996) ("recognizing the potential suggestive nature of in-court identifications where an African–American defendant is seated at counsel table" and acknowledging "the in-court identification procedure may have been suggestive or tainted," but ultimately concluding the case-specific circumstances of the in-court identification did not violate the Due Process Clause or require suppression); *United States v. Rogers,* 73 F.3d 774, 778 (8th Cir. 1996) (same); *see also United States v. Murdock,* 928 F.2d 293, 297 (8th Cir. 1991) (recognizing that such procedure may be suggestive, but not "impermissibly" so when the defendant has a fair opportunity to seek non-suggestive in-court identification procedures and/or engage cross-examination); *United States v. Greene,* 704 F.3d 298, 304-09 (4th Cir. 2013) (collecting cases involving similar situations).

It should be acknowledged that, in one prior decision, this Court recognized a split of authority amongst circuit courts regarding the Due Process test to be applied to in-court identification procedures, such that any such error could not be deemed clear under this prong of plain error review. *United States v. Shumpert,* 889 F.3d 488, 490-91 (8th Cir. 2018). However, the Supreme Court issued a subsequent

decision, which indicates the standard two-step test applies to at least some forms of out-of-court and in-court identification procedures. *Sexton,* 585 U.S. at 963-67 (employing second step of analysis regarding both out-of-court identification procedure and in-court identification procedure at preliminary hearing). In any event, after *Sexton,* this Court issued a decision that did <u>not</u> reject a plain-error challenge to an in-court identification procedure based upon the clarity of current law, but rather under the "substantial rights" prong. *United States v. May,* 70 F.4th 1064, 1075-76 (8th Cir. 2023). Based upon the above authorities, for purposes of plain-error review, the standard two-step analysis applies to the in-court identification procedure, so long as it is demonstrated that the in-court procedure gave rise to a "very substantial likelihood of irreparable misidentification." *Sexton,* 585 U.S. at 965.

Here, CL's original description of UI-3 to law enforcement was a "very broad description of the suspect," *i.e.,* "black male, anywhere from his 30s to 40s, medium build." (2:Trial Tr., at 402). At trial, Mr. Nunn was the only African-American seated at defense counsel table, such that it was obvious to CL that he was the accused defendant. *See Davis,* 103 F.3d at 670. The surprise element of identification hindered pretrial requests for non-suggestive identification, and/or effective formulation of cross-examination. *See Murdock,* 928 F.2d at 297. Hence, the in-court

identification procedure was impermissibly suggestive under the first step of the Due Process test, which leads to the multi-factor second step discussed next.

### (b). Likelihood of Misidentification

The question then turns to whether the impermissibly suggestive procedure "created a substantial likelihood of misidentification," which calls for a case-specific "reliability" inquiry involving recognized factors as follows:

*(i). Opportunity of witness to view suspect at time of crime.* CL testified that at the time of the January 2022 robbery, it was evening and "getting * * * dusky, but it wasn't fully dark." (2:Trial Tr., at 370-71). CL was seated in the driver's compartment of her personal vehicle, and UI-3 entered the driver's side rear compartment directly behind her, such that CL had to twist her body and head completely around to perceive UI-3. (2:Trial Tr., at 368-69). UI-3 was holding a gun by his side. (2:Trial Tr., at 369, 371). CL could not recall or describe UI-3's clothing, other than being "dark in color." (2:Trial Tr., at 370). UI-3 demanded CL's purse; CL screamed and UI-3 then "put the gun to [CL's] head and told [CL] to be quiet"; CL then gave UI-3 her purse, after which UI-3 exited CL's vehicle and departed in his own vehicle. (2:Trial Tr., at 369-72). All of this occurred "quickly," explained CL, (2:Trial Tr., at 372), and the government's surveillance video evidence indicates a minute or less, (2:Trial Tr., at 412-13; Gov. Ex. 31). Thus, CL had a curtailed

opportunity to view UI-3 at the time of the crime, such that this first factor indicates non-reliability of the in-court identification.

*(ii). Witness's degree of attention.* CL did not testify to having any particular observational training, nor to having consciously focused any high degree of attention to any distinctive features of UI-3—not facial features, nor voice, nor clothing, nor vehicle, nor license plate. (*E.g.,* 2:Trial Tr., at 368-73). Rather, CL's testimony reveals a state of intense emotion and fear, evidenced by her account that she "screamed" and "started kicking [her] feet" upon perceiving UI-3 seated behind her. (2:Trial Tr., at 369). Indeed, the one distinctive description she provided was the gun in UI-3's hand, which CL described as follows:

> The gun had – the barrel of the gun was black on the bottom and silver on top. It was not a revolver. It was like an actual handgun.

(2:Trial Tr., at 372). CL's self-professed state of intense emotion and focus on the UI-3's firearm indicates inattentiveness to UI-3's facial features, used during the in-court identification procedure. This factor indicates non-reliability.

*(iii). Accuracy of witness's prior description.* In the context of in-court identification, the "accuracy" factor generally considers any match or mis-match between the defendant's distinctive features and the description offered by the witness at or near the time of the crime in question. In this case, Hudson law enforcement stated that CL offered the following description of UI-3 at or near the time of the crime:

[A] black male, anywhere from his 30s to 40s, medium build. [CL] had very broad descriptions of -- I mean, she just went through a traumatic experience, so she gave me a very broad description of the suspect.

(2:Trial Tr., at 402). Mr. Nunn is an African-American man, but that appears to the be only match to CL's original description. At the time of the offense and at trial, Mr. Nunn was solidly in his late 50s, not 30s or 40s as originally described by CL. (*See, e.g.,* PSR, at F.3 (age)). Mr. Nunn is consistently described as "heavyset" in build, not "medium build" as originally described by CL. (1:Trial Tr., at 236). Even CL's description of the gun—one of the few distinctive features she described at trial with specificity—contrasts with features associated with Mr. Nunn; CL described a handgun that was "not a revolver" that was black on the bottom (presumably the grip) and silver on top (presumably the slide); however, the handgun discovered by law enforcement in Mr. Nunn's residence was a black revolver, in contrast to CL's account. (1:Trial Tr., at 215-17).

Last, though the record is not entirely clear on the matter, Hudson law enforcement testimony indicates that UI-3 was wearing a mask before, during, and after the robbery, and the government's pretrial papers take contrasting positions on the matter. (*Compare* R. Doc. 42, at 3 (describing UI-3 as "a masked male fitting Mr. Nunn's description"), *with* R. Doc. 104, at 8 (describing UI-3 as "an unmasked black man")). This suggests an original account that UI-3 was masked at the time of the robbery, which changed to un-masked as trial approached. At all events, the

overall mismatch between CL's original description and Mr. Nunn's features skew this factor to non-reliability.

*(iv). Witness's level of certainty.* The trial record indicates that CL did identify Mr. Nunn without equivocation, though it is difficult to fully judge the matter based upon a trial transcript alone. Even assuming certainty, however, defense counsel was taken by complete surprise with the in-court identification, and hence had no meaningful opportunity to develop cross-examination or impeachment evidence that might have exposed reduced levels of certainty. Under the circumstances, this factor should be deemed neutral, or at most only slightly favoring reliability.

*(v). Amount of time between crime and confrontation.* The crime occurred in January 2022 and the in-court identification occurred in May 2024—nearly 2½ years apart. The record is devoid of non-suggestive identification techniques in the interim, which might otherwise bolster confidence. The lengthy time interval suggests the identification was made based upon the show-up identification technique rather than CL's May 2024 independent recollection of the events of January 2022. This factor leans squarely toward non-reliability.

All in all, then, the two-step analysis demonstrates the in-court identification was unnecessarily and impermissibly suggestive, resulting in a substantial likelihood of misidentification. This being so, the discussion turns the third prong of plain error review involving "substantial rights" as described next.

### 3. Substantial Rights

To meet the substantial rights prong of plain error review, it must be shown that the error in question was "prejudicial" to the defendant. *United States v. Sledge,* 108 F.4th 659, 668 (8th Cir. 2024). That is to say: "The defendant's burden is to satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Id.* (cleaned up). The prong is met, for example, when the record contains "powerful evidence" the jury would have returned a not-guilty verdict, absent the error. *Id.*

The case at hand involved an unusual mix of factual allegations, some non-violent (*i.e.,* use of stolen payment cards), and some violent (armed robbery involving CL and kidnapping involving SE). Assuming for the sake of discussion the Defendant Statement is properly incorporated into the overall record and the challenged CL identification is properly removed, it may be argued that there remains sufficient evidence of non-violent acts underlying Counts 2-5 (*i.e.,* use of stolen payment cards). However, the same cannot be said of the alleged violent acts underlying Count 1 (*i.e.,* kidnapping of SE), which served as the primary driver of the lengthy 288-month sentence imposed.

Standing alone, the government's evidence for the SE Kidnapping allegations against Mr. Nunn was not strong:

- SE did not identify Mr. Nunn as UI-1.

- The law enforcement surveillance tracing technique was flawed. Even assuming UI-1's foot path had been accurately traced from SE's Lexus vehicle over the area associated with Cameras 1-9, there was a large geographical gap spanning a highly populated urban area to Camera 10 associated with Cedar Food, a store near Mr. Nunn's residence. The surveillance evidence fails to convince that UI-1 from Cameras 1-9 is the same person as Mr. Nunn entering his local store as shown in Camera 10.

- There were numerous mis-identifications in this case. Both Cedar Food employees and law enforcement mis-identified Lee as UI-1 in connection with the SE Kidnapping allegations. And law enforcement mis-identified Lasley as UI-2 in connection with the JT Theft allegations, with "certainty." This shows that surveillance tracing is a flawed and unreliable identification technique.

- The DNA identification evidence linking Mr. Nunn to SE's Lexus vehicle was merely "moderate." Certainly not convincing enough to meet the beyond-a-reasonable doubt standard as to the SE Kidnapping allegations.

CL's flawed in-court identification of Mr. Nunn as armed robber UI-3 functioned as essential other-acts evidence to prove its SE Kidnapping theory. Without that flawed evidence, the trial record fails to show Mr. Nunn commits acts

of violence; certainly not the violent allegations underlying the SE Kidnapping charges. Thus, the error was prejudicial, such that the substantial-rights prong is met.

### 4. Judicial Fairness and Integrity

The fairness-and-integrity prong of plain-error review is generally met when the error resulted in more severe sentence than otherwise would have been imposed. *Rosales-Mireles v. United States,* 585 U.S. 129, 139-42 (2018). Here, it was the violent aspects of the government's theory that drove the severe 288-month sentence (including conviction Count 1, the SE Kidnapping factual allegations, and the CL Robbery factual allegation), with the non-violent counts of conviction and factual allegations playing a much lesser role. As already shown, the flawed identification evidence was key to proving the violent acts and related count of conviction. Thus, the error meets this last prong of plain-error review as well.

### D. Requested Remedy

Because the eyewitness identification evidence violated Due Process standards under plain-error review, Mr. Nunn respectfully requests that the Court vacate the judgment of conviction and remand for a new trial. *See Foster,* 394 U.S. at 444.

**III.** **The 288-month sentence imposed upon Mr. Nunn is greater than necessary to meet the statutory purposes of federal sentencing, and is thus substantively unreasonable; the alternative upward departure similarly lacks sufficient justification in the record.**

The district court sentenced Mr. Nunn to a total term of imprisonment of 288 months, which is 54 months above the high-end of the advisory USSG range. The district court justified this sentence on two alternative bases: first, as an upward variance sentence pursuant to 18 U.S.C. § 3553(a); and alternatively, reaching the same outcome as an upward departure under USSG § 4A1.3(a), for an under-representative criminal history. The severe sentence imposed fails under either rationale, and must be reversed.

**A.** **Standard of Review**

**1.** **Upward Variance**

Before the district court, Mr. Nunn had argued for a lesser sentence than was ultimately imposed by the district court. (Sent. Tr., at 28-36). Hence, the substantive-reasonableness issue is fully preserved for this Court's review. *Holguin-Hernandez v. United States,* 589 U.S. 169, 173-75 (2020). This Court reviews a challenge to the reasonableness of a sentence by employing an abuse-of-discretion standard, in light of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Clay*, 622 F.3d 892, 895 (8th Cir. 2010).

### 2. Alternative Departure

The record does not show any specific objection to the district court's alternative USSG § 4A1.3(a) upward-departure rationale. (*See* Sent. Tr., at 1-50). However, the district court announced its alternative rationale as a brief and perfunctory "add[ition]". (Sent. Tr., at 45). The government had not advocated for the departure, and the matter had not been addressed by the district court or the parties during sentencing arguments. (Sent. Tr., at 2-36). Hence, there was no reasonable opportunity for the defense to formulate an objection to the alternative rationale, FRCrP 51(b), such that the Court should review the matter under the standard abuse-of-discretion standard. *United States v. Bullock,* 35 F.4th 666, 671 (8th Cir. 2022). Even if the Court were to apply FRCrP 52(b) plain-error review described above, such Guidelines errors ordinarily warrant relief so long as defendant can show a clear error of law. *Rosales-Mireles,* 585 U.S. at 139.

### B. Principles of Law

### 1. Upward Variance

A district court abuses its discretion and imposes an unreasonable sentence "when it fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor, or considers the appropriate factors but commits a clear error of judgment in weighing those factors." *United States v. Miner*, 544 F.3d 930, 932 (8th Cir. 2008). District courts are afforded "substantial discretion" in

weighing the various sentencing factors before it. *United States v. Godsey*, 690 F.3d 906, 912 (8th Cir. 2012). But the district court's task is not merely "to impose a reasonable sentence"; rather, "a district court's mandate is to impose a sentence *sufficient but not greater than necessary* to comply with the purposes of section 3553(a)(2)." *United States v. Toothman*, 543 F.3d 967, 971 (8th Cir. 2008) (internal quotation marks omitted).

The guideline range is the "starting point and initial benchmark" for federal sentencing. *Gall v. United States*, 552 U.S. 38, 51 (2007). When a district court deviates from the guideline range, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. The larger the court deviates from the guideline range, the more compelling the court's justification for that deviation needs to be. *Id.*

## 2.    Alternative Departure

The Guidelines permit an upward departure "if reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history." USSG § 4A1.3(a)(1). To determine the extent of the upward departure, the sentencing court is required to use "as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's."

USSG § 4A1.3(a)(4)(A); *accord United States v. Eagle Pipe,* 911 F.3d 1245, 1247-48 (8th Cir. 2019).

### C. Application to Case

#### 1. Upward Variance

Here, the district court erred in imposing a sentence 54 months—4.5 years—above the high-end of Mr. Nunn's advisory USSG range. The 288-month sentence imposed on Mr. Nunn, a 58-year-old man, was effectively a life sentence, and contemplated Mr. Nunn being imprisoned until he is 82 years-old. This sentence represents a clear error of judgment in considering and weighing the sentencing factors.

In imposing the 288-month total term of incarceration, the district court relied primarily on Mr. Nunn's criminal history and the length of time between Mr. Nunn's release from imprisonment for a prior conviction and the conduct charged in this case. (Sent. Tr., at 41-46). But the advisory sentencing guidelines already take into account the principal factors discussed by the district court.

The district court termed Mr. Nunn "incorrigible." (Sent. Tr., at 43). But a review of the PSR in his case shows that Mr. Nunn has ***no*** violent criminal history and ***no*** prior charges or convictions for kidnapping or related offenses. Mr. Nunn's prior convictions took place between 1983 and 2001, and included convictions for burglary, theft, forgery, fraud, and impersonation. (PSR ¶¶ 45-64). The PSR includes

no allegations, or convictions, regarding firearms or violence. (*Id.*). Considering all of this, the district court did not and could not adequately justify its determination that Mr. Nunn was "incorrigible" such that a 54-month upward variance was appropriate. *See Gall*, 552 U.S. at 50-51.

Moreover, the district court's description of Mr. Nunn's conduct in the instant case somewhat differed from that found by the jury. At sentencing, the district court placed great weight on the instant offenses being "premeditated," and emphasized how "geographically widespread" Mr. Nunn's conduct was. (Sent. Tr. at 41-42). But the jury did not find premeditation, and the geographic locus of conduct provides no basis for the severe variance imposed here.

The district court discussed, but did not adequately weigh, mitigating factors including Mr. Nunn's advanced age and "tragic" upbringing. (*See* Sent. Tr. at 44-45). The PSR detailed Mr. Nunn's difficult upbringing, including that his parents and other role models were engaged in serious criminal activities from the early days of Mr. Nunn's life. (*Id.*). Mr. Nunn grew up bouncing between foster homes and his biological family members, and eventually was pulled into a life of crime and exposure to drugs and violence by his father. (*See* PSR ¶¶ 81-90). He has suffered gunshot wounds on various occasions, a brain hemorrhage, and other serious physical ailments. (*Id.* ¶¶ 93-96). Mr. Nunn was 58 years-old at the time of sentencing, (*see id.*), which means he will be 82 years-old after a 288-month

sentence of imprisonment. The district court did not adequately consider and weigh these significant mitigating factors, and instead imposed what is effectively a life sentence on Mr. Nunn.

### 2.    Alternative Departure

Similarly, the alternative rationale for the severe sentence—a USSG § 4A1.3(a) departure for under-representative criminal history—lacks support in the record. The district court did not follow the most basic requirements for imposing such a departure, *i.e.,* failure to determine "the criminal history category applicable to defendants whose criminal history * * * most closely resembles that of the defendant's." § 4A1.3(a)(4)(A). The record shows this alternative sentencing rationale was essentially an afterthought which lacked substantive justification in the record. (Sent. Tr., at 45). It certainly cannot justify the severe upward departure imposed here.

### D.    Requested Remedy

Owing to the above defects, Mr. Nunn respectfully requests that the sentence be vacated, and the case be remanded to the district court for re-sentencing.

## CONCLUSION

For all these reasons, Defendant-Appellant Mr. Nunn respectfully requests that the Court vacate the district court's judgment, and remand the case to the district court for re-trial and/or other appropriate proceedings.

Dated: May 2, 2025                    Respectfully submitted,

*s/ Kate Adams*
_____
KATE ADAMS
ERIC RIENSCHE
Assistant Federal Defenders

Office of the Federal Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Defendant-Appellant*

In the
United States Court of Appeals
For the Eighth Circuit

| United States of America, | ) | |
| Plaintiff-Appellee, | ) | **No. 24-3512** |
| | ) | |
| vs. | ) | **CERTIFICATE OF COMPLIANCE** |
| | ) | |
| Raphael Raymond Nunn, | ) | |
| Defendant-Appellant. | ) | |

1.  This document complies with the type-volume limitation of FRAP 32(a)(7)(B). Excluding the items listed in FRAP 32(f), this brief contains 11,293 words.

2.  This document complies with the typeface requirements of FRAP 32(a)(5) and type-style requirements of FRAP 32(a)(6). This document has been prepared in proportionally spaced typeface, using Microsoft Word, in a 14-point Times New Roman style.

3.  The electronic version of this document has been scanned for viruses, and the scan indicates the electronic version is virus free.

Dated: May 2, 2025                    *s/ Kate Adams*

                                   Assistant Federal Defender

In the
United States Court of Appeals
For the Eighth Circuit

| United States of America, | ) | |
|---|---|---|
| Plaintiff-Appellee, | ) | **No. 24-3512** |
| | ) | |
| vs. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| Raphael Raymond Nunn, | ) | |
| Defendant-Appellant. | ) | |

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Raphael Nunn

Dated: May 2, 2025                 *s/ Kate Adams*

Assistant Federal Defender